

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**FELONY**

INDICTMENT FOR CONSPIRACY TO COMMIT
HEALTH CARE FRAUD AND HEALTH CARE FRAUD

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 25-174 |
| v. | * | SECTION: SECT. OMAG. 3 |
| STEVEN D. PEYROUX | * | VIOLATIONS: 18 U.S.C. § 1349 |
| | * | 18 U.S.C. § 1347 |

\*    \*    \*

The Grand Jury charges that:

## COUNT 1
(Conspiracy to Commit Health Care Fraud)

**A.    AT ALL TIMES RELEVANT HEREIN:**

### The Medicare Program

1.    The Medicare program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

2. Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b), and a "[f]ederal health care program" within the meaning of Title 42, United States Code, Section 1320a-7b(f).

3. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a unique Medicare identification number. These beneficiary identification numbers were used to determine a beneficiary's eligibility for Medicare benefits and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services.

4. As part of the Medicare enrollment process, health care providers ("providers") submitted enrollment applications to Medicare. The Medicare provider enrollment application required a provider, or an authorized representative of the provider, to certify that the provider would comply with all Medicare-related laws, rules, and regulations, including the Federal Anti-Kickback Statute, and that the provider "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

5. A Medicare "provider number" was assigned to a provider upon approval of the provider enrollment application, after which, the provider was able to file claims with Medicare to obtain reimbursement for benefits, items, or services rendered to beneficiaries.

6. Medicare covered different types of benefits and was separated into different program "parts," including medical services ("Part B"). Part B covered diagnostic testing, among other things, when certain criteria were met.

7. Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for

Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.

8. Medicare would not reimburse providers for claims that were not medically reasonable or necessary, or procured in violation of the Federal Anti-Kickback Statute, including the provision of the Federal Anti-Kickback Statute prohibiting the purchase, sale, and distribution of Medicare beneficiary identification numbers.

### Over-the-Counter COVID-19 Tests

9. Starting on April 4, 2022, and continuing through the duration of the COVID-19 public health emergency, Medicare covered and paid for over-the-counter ("OTC") COVID-19 tests at no cost to beneficiaries. This program was intended to ensure beneficiaries had access to COVID-19 tests they needed to stay safe and healthy during the COVID-19 pandemic. Eligible providers capable of providing ambulatory health care services, which did not include chiropractors, were permitted to distribute to beneficiaries OTC COVID-19 tests that were approved, authorized, or cleared by the U.S. Food and Drug Administration.

10. Medicare would not pay for more than eight OTC COVID-19 tests, per calendar month, per beneficiary. Providers could distribute OTC COVID-19 tests only to beneficiaries who requested them, and providers were required to keep documentation showing a beneficiary's request for the tests. Medicare did not cover OTC COVID-19 tests distributed to beneficiaries during an inpatient stay at a hospital or skilled nursing facility.

### The Defendant and Related Individuals and Entities

11. The defendant, **STEVEN D. PEYROUX ("PEYROUX")**, was a chiropractor and a resident of Canton, Georgia. **PEYROUX** owned and operated several purported health care consulting companies, including The Legacy Doctors, LLC ("Legacy Doctors") and Physicians

3

Business Solutions, LLC ("PBS"), which offered medical providers access to various money-making schemes through Medicare and other insurance providers in exchange for payment, often a monthly consulting fee. One scheme that **PEYROUX** offered providers within Legacy Doctors and PBS, among other networks, was the opportunity to purchase beneficiary information for hundreds of thousands of Medicare beneficiaries in order to fraudulently bill Medicare for OTC COVID-19 tests (the "COVID-19 test scheme"). **PEYROUX** held himself out as an expert in navigating the United States health care system, publishing multiple books on the subject.

12. Mansinh Chaudhari ("Monsi"), a resident of Illinois, was the owner and operator of Koova Consulting, LLC ("Koova"), a purported New York based consulting company. Monsi obtained and sold beneficiary information in connection with the COVID-19 test scheme.

13. Dennis Peyroux ("Dennis"), **PEYROUX's** brother, was a resident of Slidell, Louisiana. Dennis was a chiropractor and the owner of Global Medical Center, L.L.C. ("Global"), a Louisiana limited liability company doing business in Slidell, Louisiana, in the Eastern District of Louisiana. Global operated as a chiropractic clinic and was also registered with Medicare as a medical supply company. Dennis purchased beneficiary information and billed Medicare for supplying OTC COVID-19 tests through Global.

14. Other medical providers that invested in the COVID-19 test scheme in connection with **PEYROUX** included: Provider 1, a chiropractor based in or around Texas; Provider 2, a chiropractor based in or around Pennsylvania; Provider 3, a chiropractor based in or around Tennessee; Provider 4, a chiropractor based in or around Georgia; Provider 5, a chiropractor based in or around Colorado; and Provider 6, another chiropractor based in or around Colorado (collectively, with Dennis, the "Participating Providers").

15. Individual 1, a resident of Georgia, was the chief operating officer of PBS. Individual 1 reported to **PEYROUX**.

B. **THE CONSPIRACY**:

Beginning in or around November 2022, and continuing through in or around July 2023, in the Eastern District of Louisiana, and elsewhere, the defendant, **STEVEN D. PEYROUX**, did knowingly and willfully conspire with others known and unknown to the Grand Jury, to execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

C. **THE PURPOSE OF THE CONSPIRACY**:

It was a purpose of the conspiracy for **PEYROUX** and his co-conspirators to unlawfully enrich themselves by, among other things:

1. Purchasing, selling, and distributing, and arranging for the purchase, sale, and distribution, of beneficiary information, including beneficiary names, dates of birth, social security numbers, and beneficiary identification numbers;

2. Submitting, and causing the submission of, false and fraudulent claims to Medicare for OTC COVID-19 tests that were not requested by beneficiaries and ineligible for Medicare reimbursement;

3. Concealing the purchasing, selling, and distributing of beneficiary information, and the submission of false and fraudulent claims for OTC COVID-19 tests to Medicare; and

4.      Diverting proceeds of the fraud for the personal use and benefit of **PEYROUX** and his co-conspirators, and to further the fraud.

**D.      THE MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which **PEYROUX** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

1.      In or around November 2022, **PEYROUX** learned that Medicare, in order to curb the spread of COVID-19, was reimbursing providers nationwide to provide OTC COVID-19 tests to beneficiaries, but only if the beneficiary requested the test.

2.      In order to capitalize on what he viewed as a lucrative financial opportunity, **PEYROUX**, in conspiracy with Monsi and others, solicited Medicare providers, including Participating Providers, to purchase beneficiary information from Monsi for hundreds of thousands of beneficiaries throughout the United States, including their names, dates of birth, and Medicare identification numbers, as well as falsified recordings of individuals purporting to be the beneficiaries requesting OTC COVID-19 tests.

3.      Participating Providers then used the information to falsely and fraudulently bill Medicare, on a monthly basis, for eight OTC COVID-19 tests purportedly provided to the beneficiary—the maximum allowable by Medicare under the program—until the beneficiary complained or died, or Medicare's OTC COVID-19 test program ended.  The OTC COVID-19 tests were not requested by the beneficiary and were ineligible for Medicare reimbursement.

4.      Participating Providers paid Monsi, through Koova, a kickback of approximately $56 for each beneficiary name, of which **PEYROUX** received $5 per beneficiary.  The payment to Monsi was based on the volume and value of Medicare's reimbursement for the OTC COVID-

19 tests billed. **PEYROUX** also received a monthly "consulting" fee from certain Participating Providers in exchange for advising them on the scheme.

5.  **PEYROUX** also personally paid Monsi kickbacks in exchange for beneficiary information, which he used to submit, and cause to be submitted, false and fraudulent claims to Medicare for OTC COVID-19 tests through Global and Provider 2.

6.  **PEYROUX** solicited multiple providers to join the fraudulent scheme, because **PEYROUX**, Monsi, and other co-conspirators believed that spreading the submission of false and fraudulent claims across multiple providers would avoid the scrutiny of Medicare.

7.  **PEYROUX** targeted chiropractors with so-called "integrated" medical practices—meaning they employed doctors and nurse practitioners—to join the fraudulent scheme because they could use credentials of their medical staff to bill for the tests and not be flagged by Medicare. **PEYROUX** and co-conspirators pitched the scheme as "easy" money, where the chiropractor "really didn't need [] to do anything" except provide credentials for billing.

8.  **PEYROUX** and co-conspirators knew beneficiaries did not request the OTC COVID-19 tests or want the OTC COVID-19 tests because multiple beneficiaries complained about receiving unwanted tests and/or threatened to contact Medicare about fraud related to their receipt of the tests. To ensure billing continued, **PEYROUX** and co-conspirators, with the assistance of Individual 1, provided Participating Providers "replacement" beneficiary names that they could exchange for those who died or complained, sometimes free of charge. **PEYROUX** also appointed Individual 1 to act as an intermediary between Participating Providers and Monsi after complaints surfaced.

9.  On several occasions, Participating Providers falsely and fraudulently billed Medicare for OTC COVID-19 tests purportedly provided to beneficiaries who were already

deceased or in hospice or inpatient care and therefore ineligible to receive OTC COVID-19 tests under the program, which **PEYROUX** knew.

10. In order to conceal the arrangement, **PEYROUX** directed Participating Providers to sign a sham "patient education & supply services agreement" with Monsi, in which the parties purportedly agreed to comply with the Federal Anti-Kickback Statute. The agreement outlined a purported approval process wherein the provider would receive and review a "Request and Authorization form" for an OTC COVID-19 test, and if allowable, authorize Monsi to ship the test. In reality, no such review took place. Instead, Participating Providers simply purchased a list of beneficiaries from Monsi and billed Medicare for eight OTC COVID-19 tests for each beneficiary on the list, which **PEYROUX** knew.

11. Monsi also issued invoices to Participating Providers through Koova that included false line items, including payment for consulting fees and/or "CMS OTC fulfilment," in order to conceal the fact he was receiving kickbacks, which **PEYROUX** knew.

12. To further conceal the scheme, **PEYROUX** and co-conspirators advised Participating Providers on how to respond to Medicare audits in a manner that concealed the scheme. For example, Participating Providers were instructed to falsely state that Koova provided them "OTC fulfillment services," when no such services occurred, to conceal the kickback payments. Additionally, **PEYROUX** helped draft Global's written response to a Medicare audit concerning OTC COVID-19 tests, and advised on others, including how to design fabricated medical records where medical providers purportedly request the tests.

13. In order to conceal his financial involvement in the scheme, **PEYROUX** directed that all money paid by him and paid to him, in connection with the scheme, be run through bank accounts held nominally by **PEYROUX's** relatives but controlled by **PEYROUX**.

8

14.   In total, from in or around November 2022, and continuing through in or around July 2023, in the Eastern District of Louisiana, and elsewhere, **PEYROUX**, in conspiracy with Monsi, the Participating Providers, and others, submitted and caused the submission of approximately $12.1 million in claims to Medicare for OTC COVID-19 tests that were not requested and ineligible for reimbursement, for which Medicare reimbursed approximately $11.0 million.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-3
(Health Care Fraud)

**A.    AT ALL TIMES RELEVANT:**

The allegations in Part A of Count 1 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

**B.    THE SCHEME:**

On or about the dates set forth below, with respect to each count, in the Eastern of Louisiana, and elsewhere, the defendant, **STEVEN D. PEYROUX**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, and aided and abetted others in executing, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare.

**C.    THE MANNER AND MEANS OF THE SCHEME:**

The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as a description of the scheme and artifice.

D.  **THE OFFENSES:**

In order to execute and attempt to execute the scheme to defraud and to obtain money and property, and to accomplish the objects of the scheme, the defendant, **STEVEN D. PEYROUX**, submitted, caused others to submit, and aided and abetted others in submitting, from the Eastern District of Louisiana, the following false and fraudulent claims, seeking the identified dollar amounts, and representing that such benefits, items, and services were medically necessary and eligible for Medicare reimbursement, with each execution set forth below forming a separate count:

| Count | Beneficiary | Date Claim Submitted | Date Services Purportedly Rendered | Description of Claim | Purported Referring Provider | Amount Billed |
|---|---|---|---|---|---|---|
| 2 | D.S. | 02/13/2023 | 01/24/2023 | K1034 (Provision of COVID-19 Test) | Individual 2 | $96 |
| 3 | C.S. | 03/03/2023 | 02/23/2023 | K1034 (Provision of COVID-19 Test) | Individual 2 | $96 |

Each of the above is a violation of Title 18, United States Code, Section 1347.

**NOTICE OF FORFEITURE**

1.  The allegations of Counts 1 through 3 of this Indictment are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2.  As a result of the offenses alleged in Counts 1 through 3, the defendant, **STEVEN D. PEYROUX**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

3.  If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a.  cannot be located upon the exercise of due diligence;

   b.  has been transferred or sold to, or deposited with, a third party;

   c.  has been placed beyond the jurisdiction of the Court;

   d.  has been substantially diminished in value; or

   e.  has been commingled with other property which cannot be divided without difficulty,

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.



MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

LORINDA I. LARYEA
ACTING CHIEF, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

_Nicholas Moses for KZW_
KELLY Z. WALTERS
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice

_Nick Moses_
NICHOLAS D. MOSES (La. Bar # 41587)
Assistant United States Attorney
Eastern District of Louisiana

New Orleans, Louisiana
June 20, 2025

No. _____

# United States District Court

FOR THE

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

vs.

STEVEN D. PEYROUX

INDICTMENT FOR CONSPIRACY TO
COMMIT HEALTH CARE FRAUD
AND HEALTH CARE FRAUD

Filed _____, 20 25

_____, Clerk.

By _____, Deputy

_/s/ Nicholas Moses_
NICHOLAS D. MOSES
Assistant United States Attorney